

**FILED**
Jun 02 2015, 8:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Nicholas K. Kile
Mark J. Crandley
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Stephen C. Unger
Paul D. Vink
Bradley M. Dick
Bose McKinney & Evans LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Town of Zionsville, Indiana,

*Appellant-Defendant,*

v.

Town of Whitestown, Indiana,
and Angel Badillo,

*Appellee-Plaintiff*

June 2, 2015

Court of Appeals Cause No.
06A01-1410-PL-432

Appeal from the Boone Superior
Court
The Honorable Rebecca M. McClure
Cause No. 06D02-1406-PL-64

**Bailey, Judge.**

# Case Summary

The Town of Zionsville ("Zionsville") appeals the entry of summary judgment against it and in favor of the Town of Whitestown and Angel Badillo (collectively, "Whitestown") with respect to the parties' claims and counterclaims concerning 1) Zionsville's proposed reorganization with Perry Township, in Boone County, and 2) Whitestown's proposed annexation of portions of Perry Township.

Zionsville's appeal presents novel questions concerning the construction of numerous provisions of the Indiana Government Modernization Act of 2006 ("the Act"), *see* Ind. Code § 36-1.5-1-1 *et seq.*, and how provisions of the Act operate in conjunction with other statutes that regulate the operation of local governments in Indiana. The trial court concluded at summary judgment that, even with the Act's significant liberalization of the rules concerning reorganization and territorial boundary-drawing at the level of local government, Zionsville cannot "leap-frog" Whitestown in an effort to reorganize with portions of Perry Township which are not contiguous with Zionsville. Appellees' Br. at 1.

Zionsville appeals. We reverse and remand.

# Issue

[4] Zionsville presents for our review several issues, which we present as the single issue of whether the trial court erred when it granted summary judgment for Whitestown on its claims and on Zionsville's counterclaims.[1]

# Facts and Procedural History

[5] In 2010, Zionsville reorganized with two townships in Boone County, Eagle Township and Union Township ("the 2010 Reorganization"). Zionsville's town boundaries were entirely within Eagle Township prior to the reorganization. The 2010 Reorganization resulted in the dissolution of the separate township governments of Eagle and Union. All government functions previously carried out by the townships were consolidated into Zionsville's governmental bodies, and portions of the territory previously held by the townships were absorbed into Zionsville.

[6] At the time of the 2010 Reorganization, portions of Whitestown were in Eagle Township. Other portions of Whitestown were in Perry Township, which shared a border with the southwest corner of Eagle Township, and still other portions lay in Worth Township. *See* Appellees' Br. at 7.

[7] In 2013, Whitestown adopted an ordinance to annex a portion of land in Perry Township, which was to be used as a home for Whitestown's planned Waste

---

[1] The trial court's order addresses a counterclaim by Zionsville alleging breach of contract related to certain interlocal agreements. Zionsville did not address this matter in its appeal, and we accordingly leave the trial court's entry of summary judgment on that question undisturbed.

Water Treatment Plant ("the 2013 Annexation"). A remonstrance was filed and the case is presently pending before this Court. *See* Docket for Ind. Ct. App. Cause No. 29A05-1409-MI-00437.

[8] On April 18, 2014, Perry Township adopted a resolution to consider plans to reorganize with Zionsville. On April, 21, 2014, Zionsville also adopted a similar resolution.

[9] On April 22, 2014, one day after Zionsville adopted its resolution, Whitestown introduced four proposed annexation ordinances for territory within Perry Township, and for territory within the boundaries of Eagle Township that Zionsville had not included in the 2010 Reorganization ("the 2014 Ordinances"). All of the territory sought to be annexed under the 2014 Ordinances was also within the scope of territory to be incorporated in Zionsville under the 2014 Zionsville Plan. Appellees' Br. at 7.

[10] On May 20, 2014, Zionsville and Perry Township each adopted an identical plan for reorganization ("the 2014 Zionsville Plan," "the 2014 Plan," or "the plan"). The plan would reorganize Perry Township's government with that of Zionsville. Perry Township's government would cease to exist, and all township government functions and offices would be incorporated into those of Zionsville.

[11] As to the territorial scope of the 2014 Zionsville Plan, all of the land included within Perry Township but outside of Whitestown—including territory subject to the 2013 Annexation—would be incorporated into Zionsville. Further, the

2014 Zionsville Plan included provisions that would redraw the existing boundaries of Zionsville to include portions of land that had previously been part of Eagle Township prior to the 2010 Reorganization, but which had not been included in that reorganization. In sum, then, the 2014 Plan would incorporate into Zionsville all the territory encompassed by the 2014 Ordinances adopted by Whitestown, as well as the remainder of Perry Township.

[12] None of the portions of Perry Township that the 2014 Zionsville Plan identified as being part of a reorganized Zionsville included land physically adjacent to territory that had been incorporated into Zionsville in the 2010 Reorganization. Zionsville, however, had been providing township services within Whitestown throughout the geographic areas that previously belonged to Eagle Township, up to the boundary between Perry and Eagle Townships.

[13] On June 24, 2014, Whitestown filed suit against Zionsville, challenging the validity of the 2014 Zionvsille Plan and seeking a declaratory judgment invalidating the Plan. Zionsville answered and filed a counterclaim, contending that Whitestown lacked authority to pursue its annexation plans as reflected in the 2014 Ordinances, which had been made available for public comment.[2] Whitestown and Zionsville filed cross-motions for summary judgment, which proceeded to a hearing on September 9, 2014.

---

[2] The 2014 Ordinances were not adopted prior to the initiation of this appeal.

On October 7, 2014, the trial court granted summary judgment in favor of Whitestown, concluding that the 2014 Zionsville Plan was contrary to the provisions of and therefore was not authorized by the Act. The court also concluded that, contrary to Zionsville's counterclaim, Whitestown had the necessary statutory authority to pursue its annexation plans. Zionsville sought a stay of the trial court's order pending appeal, which the trial court denied on October 9, 2014.

This appeal ensued.[3]

# Discussion and Decision

## Standard of Review

This case comes to us on appeal from the trial court's order granting summary judgment in Whitestown's favor upon cross-motions for summary judgment. On appellate review of an entry of summary judgment, we use the same standard as that used by the trial court. *Bushong v. Williamson*, 790 N.E.2d 467, 473 (Ind. 2003). Summary judgment is appropriate only when the designated evidence establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). We construe all facts and inferences therefrom in favor of the non-moving party.

---

[3] In the interim, the public question on the 2014 Zionsville Plan proceeded to voters. Voters approved the plan on November 4, 2014. On November 24, 2014, the Indiana Supreme Court denied a petition by Zionsville for transfer of jurisdiction for purposes of direct appellate review.

*Bushong*, 790 N.E.2d at 473. We limit our review of factual matters to the materials the parties designated to the trial court. *Id.*

[17] A trial court's entry of summary judgment comes "clothed with a presumption of validity." *Kader v. State*, 1 N.E.3d 717, 725-26 (Ind. Ct. App. 2013) (citations and quotation marks omitted). Where, as here, the trial court enters its summary judgment order in the form of findings and conclusions, these offer valuable insight into the trial court's rationale for its decision and facilitate our review. *Spudich v. NIPSCO*, 745 N.E.2d 281, 290 (Ind. Ct. App. 2001), *trans. denied*. A trial court's findings and conclusions at summary judgment do not limit our review of the order, and we may affirm a grant of summary judgment upon any theory supported by the evidence. *Id.*

[18] That an appeal is from cross-motions for summary judgment does not alter our standard of review. *Mahan v. Amer. Standard Ins. Co.*, 862 N.E.2d 669, 676 (Ind. Ct. App. 2007), *trans. denied*. We consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

[19] Where, as here, the core of the dispute centers upon the interpretation of statutes, we use established rules of statutory construction "to give effect to the General Assembly's intent." *Ballard v. Lewis*, 8 N.E.3d 190, 194 (Ind. 2014). The best evidence of the legislature's intent is the statutory text. *Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012). When a statute's language is clear and unambiguous, there is "no room for judicial construction." *Ballard*, 8 N.E.3d at 194.

Ambiguous language, however, is open to judicial construction. *Id.* A statute is ambiguous when it admits of more than one reasonable interpretation, and in such situations we resort to rules of statutory construction to give effect to the legislature's intent. *Adams*, 960 N.E.2d at 798. We read the statute as a whole and avoid "excessive reliance on a strict, literal meaning or the selective reading of individual words." *Id.*

## The 2006 Government Modernization Act

This case raises for the first time for this Court's consideration the interpretation of numerous provisions of 2006's Government Modernization Act.[4] First enacted by our Legislature in 2006 with specific portions subsequently amended, the Act affords local governments "broad powers to enable political subdivisions to operate more efficiently by eliminating restrictions under existing law" that might otherwise impede the efficient and cooperative administration and functioning of local governments. I.C. § 36-1.5-1-1(1). The Act thus "contains full and complete authority for … reorganization of political subdivisions." I.C. § 36-1.5-1-2(1). Where conflicts arise between the Act and other law, compliance with the Act serves to satisfy the requirements for complying with any conflicting laws, I.C. § 36-1.5-1-6, and the Act is to be liberally construed to effect its purposes. I.C. § 36-1.5-1-5.

---

[4] The Indiana Supreme Court has considered portions of the Act in the limited context of a certified question from a U.S. District Court in a challenge to certain voting provisions of a reorganization plan. *See* discussion *infra* of *Kole v. Faultless*, 963 N.E.2d 493 (Ind. 2012).

[22] In furtherance of its purposes, the Act sets forth a new framework for the reorganization of, and the redrawing of boundaries between, local governments. Previously-enacted statutes concerning annexation of territory by a local government generally required that the annexing government and the annexed territory be contiguous with one another. *See, e.g.,* I.C. § 36-4-3-4(a)(1). The Act leaves those statutes undisturbed. However, the Act provides an alternate route for local governments to incorporate other territory by means of the wholesale reorganization of subdivisions of local government. That is, the Act provides that certain political subdivisions may, with the consent of certain classes of voters, adopt and enact plans that allow local government bodies to merge with one another while redrawing territorial boundary lines. I.C. § 36-1.5-4-1 *et seq.*

[23] Like prior statutes, the Act ensures that no portion of any Indiana county that does not participate in a reorganization will be deprived of township services. The Act does so, however, in a different manner. In prior statutes governing the establishment and abolition of townships, our statutes provided that "any territory in a county…not included in one (1) of the townships…is included in the township that: (1) is contiguous to that territory; and (2) contains the least population of all townships contiguous to that territory." I.C. § 36-6-1-12.

[24] In contrast, the Act distinguishes between portions of a township whose political offices have been reorganized and the remainder of the township. Thus, when the political bodies of a township reorganize and some areas of the township do not participate in that plan:

> the reorganized political subdivision continues to be responsible after the reorganization for providing township services in all areas of the township, including within the territory of a municipality in the township that does not participate in the reorganization.

I.C. § 36-1.5-4-40.5(2)(A). This provision affords flexibility in the reorganization of township governing bodies, while also ensuring that areas of municipalities not participating in township reorganizations are not deprived of township services.

[25] The flexibility envisioned by the Act is the culmination of a long period of development in the Indiana General Assembly's delegation of authority to local governments, from a Dillon Rule-based approach of limited delegated authority to a home-rule regime. *See Kole v. Faultless*, 963 N.E.2d 493, 495-96 (Ind. 2012) (discussing the Dillon Rule and the use of *ultra vires* challenges to local government action, and exploring forty years' development of liberalized local government authority in Indiana). Thus, in 2007, the General Assembly amended the Indiana Home Rule Act such that "a unit is presumed to possess broad powers of local government, unless the Indiana Constitution or a statute expressly denies the unit that power, or expressly grants it to another entity." *Id.* at 496 (citing I.C. § 36-1-3-5).

[26] "Against this ever-liberalizing landscape," the Act has afforded even broader powers to local government to permit not only the exercise of authority and power, but also "'full and complete authority' to reorganize, exercise governmental functions under a cooperative agreement, and transfer responsibilities between offices and officers." *Id.* (quoting I.C. § 36-1.5-1-2).

The Act creates new mechanisms vis-à-vis traditional annexation for the incorporation into municipalities of unincorporated areas of townships. These mechanisms favor reorganization of local governments by consent of the governed to forced annexation.

[27] In light of all this, at issue here is whether Zionsville, as reorganized under the 2010 Plan, was denied the power to reorganize with Perry Township under the 2014 Zionsville Plan, and if Zionsville was denied such power, whether Whitestown could properly move forward with its annexation efforts.

## Mootness

[28] As a threshold issue, Whitestown argues that because Zionsville did not successfully obtain a stay of the trial court's summary judgment order, the 2014 Zionsville Plan was *ipso facto* void. The results of the election as to the 2014 Zionsville Plan were therefore of no effect, and as a result, Whitestown contends, Zionsville's appeal is moot. For its part, Zionsville contends that the public question concerning the reorganization appeared on the ballot and received a majority vote. Further, Whitestown did not seek emendation of the ballot from county election officials, Zionsville argues, and thus the appeal can proceed.

[29] We find the Indiana Supreme Court's opinion in *White v. Ind. Democratic Party ex re. Parker*, 963 N.E.2d 481 (Ind. 2012), instructive. In *White*, the Indiana Democratic Party brought an (ultimately untimely) challenge to the eligibility of Charlie White for the office of the Secretary of State of Indiana. *Id.* at 490.

Surveying Indiana case law on election challenges, part of the *White* Court's rationale rested on the principle that Indiana law seeks to honor voters' decisions so that "the will of the people in the choice of public officers may not be defeated by any merely formal or technical objections." *Id.* at 486 (citations and quotation marks omitted). "[V]oters who are lawfully qualified to participate in our democratic process may not be disenfranchised except by their own willful or deliberate act to the extent that one who did not receive the highest vote cast may still be declared elected." *Id.* (citations and quotation marks omitted). Thus, "[t]he existence of a fact which disqualifies, and of the law which makes that fact operate to disqualify, must be brought home so closely and so clearly to the knowledge or notice of the elector, as that to give his vote therewith indicates an intent to waste it." *Id.* (quoting *Oviatt v. Behme*, 238 Ind. 69, 74, 147 N.E.2d 897, 900 (1958)).

[30] Here, as in *White*, we are confronted with litigation over the proper qualification of a choice posed to Indiana voters on an election ballot. There is no evidence that voters intentionally sought to waste their votes on the public question, and a majority of voters appear to have ratified the 2014 Zionsville Plan. Law and public policy in our state favor recognizing the validity of the choices of voters absent specific evidence that voters necessarily sought to waste their votes. We accordingly decline Whitestown's invitation to conclude that Zionsville's appeal is moot.

# Reorganization of Zionsville and Perry Township

## Zionsville's Claim to Hybrid Status under the Act

[31] Zionsville claims it was authorized to reorganize with Perry Township under either of two provisions of the Act, in Indiana Code section 36-1.5-4-1(a):

> Any of the following may reorganize under this chapter:
>
> (2) Two (2) or more townships located entirely within the same county. A township reorganizing under this subdivision must be adjacent to at least one (1) other township participating in the reorganizations;
>
> ***
>
> (7) A township and a municipality that is located in any part of the same township….

I.C. § 36-1.5-4-1(a).

[32] These provisions, as well as most other provisions of the Act, have not yet been interpreted by Indiana's appellate courts. The sole case interpreting the Act is the Indiana Supreme Court's decision in *Kole*, *supra*. In *Kole*, which involved a certified question from the U.S. District Court for the Southern District of Indiana, the plaintiffs sought to challenge a plan of reorganization involving the Town of Fishers and Fall Creek Township; the two governments sought to reorganize into a city with an elected city commission but an appointed mayor, a novel structure for a second class city.[5] *Id.* at 495-97. Characterizing the

---

[5] A second class city is defined by our statutes as a city with a population of between 35,000 and 599,999. I.C. § 36-4-1-1(a).

General Assembly's direction on principles of local government operation as "ever-liberalizing," *id.* at 496, and noting that the Act does not by its terms in Section 36-1.5-4-1(a) "limit the resulting forms the reorganized political subdivision may take," *id.* at 497, the *Kole* Court observed:

> it is far less burdensome on both the courts and the Legislature for the law to presume the existence of local authority to act absent some express prohibition, than it is to require legislation spelling out every detail of every permissible action a municipality may take. So the General Assembly has said, several times over multiple recent decades.

*Id.* at 498. Based on this reasoning, the *Kole* Court concluded that Fishers and Fall Creek Township could, within the scope of powers afforded by the Act, reorganize into a city without an elected mayor.

[33] Here, Zionsville contends that it was acting within statutory authority under Subsection 36-1.5-4-1(a) to reorganize with Perry Township. Whitestown argues to the contrary. It contends—and the trial court agreed—that Subsection 36-1.5-4-1(a)(2) does not apply because Zionsville is a town, not a township.[6]

[34] Zionsville acknowledges that it is a town in terms of its formal structure. However, Zionsville argues that as a result of the 2010 Reorganization, it no longer bears only the powers of a town, but also those of a township. Specifically, Zionsville relies upon the following statutory provision:

---

[6] The trial court also concluded that Zionsville could not proceed with the Plan based upon Subsection 36-1.5-4-1(a)(7); because we resolve this appeal on the basis of Subsection (a)(2), we do not address Subsection (a)(7) further.

The following apply in the case of a reorganization under this article that includes a township and another political subdivision:

***

(2) Except as provided in subdivision (3):[7]

(A) the reorganized political subdivision continues to be responsible after the reorganization for providing township services in all areas of the township, including within the territory of a municipality in the township that does not participate in the reorganization; and

(B) the reorganized political subdivision retains the powers of a township after the reorganization in order to provide township services as required by clause (A).

I.C. § 36-1.5-4-40.5

[35] Based upon these provisions, Zionsville contends that after the 2010 Reorganization it continued to exercise the powers of a town *and* that it gained the powers of a township, including the authority under Subsection 36-1.5-4-1(a)(2) to exercise reorganization powers in the same manner as a township. Zionsville contends that this is the meaning of the legislative language in Subsection 36-1.5-4-40.5(2)(B), "retains the powers of a township…in order to provide township services as required by clause (A)."  In short, Zionsville contends that it assumed a town/township hybrid status as a result of the 2010 Reorganization, and this hybrid status permitted it to act in the manner of a township in its efforts to reorganize with Perry Township.

---

[7] Subsection 36-1.5-4-40.5(3) pertains to the operation of interlocal agreements for provision of local government services.  Neither party argues that Subsection 36-1.5-4-40.5(3) has any bearing upon the case.

[36] While township governments provide an array of services, *see* I.C. § 36-6-4-3 (designating as among the duties of a township executive fire protection in some circumstances, provision of township assistance, weed control, cemeteries, and insulin distribution to the poor), the Act does not delineate what township powers are necessary to provide township services under Subsection 36-1.5-4-4.5(2). However, some provisions of the Act make specific exceptions from the powers accorded to municipalities that reorganize with townships. For example, Subsection 36-1.5-4-40.5(6) specifically restricts political subdivisions that reorganize with townships from borrowing money under Indiana Code subsections 36-6-6-14(b) and (c), which govern the procedures by which townships may borrow from township funds to pay for firefighting or other emergency services.

[37] Still other provisions of the Act treat a political subdivision reorganized under the Act as a township regardless of the formal structure selected as a result of the reorganization plan. For example, Subsection 36-1.5-4-40.5(7) provides for a different calculation of the ad valorem property tax levy for a reorganized political subdivision's firefighting fund under Indiana Code section 36-8-13-4. Section 36-8-13-4 addresses aspects of the property tax levy pertinent to township firefighting funds. Thus, under the terms of the Act, a reorganized political subdivision's firefighting fund is treated as though it is that of a township—without regard to whether the ultimate form of the reorganized subdivision is itself a town, a township, or some other entity.

[38]     These statutory provisions thus permit broad changes to the functioning of local governments with few of the limitations attendant to prior statutory schemes regulating local government, and are consonant with the Act's express statements of purpose, including enabling the streamlining and greater efficiency of local government, reducing the costs to taxpayers of the operation of local government, I.C. §§ 36-1.5-1-1(1), (2)(A) & (3), and improving the ability of local governments to provide "critical and necessary services." I.C. § 36-1.5-1-1(2)(B). They are also consonant with the legislature's guidance that the Act should be liberally construed to effect the Act's purposes, I.C. § 36-1.5-1-5, and with the *Kole* Court's reasoning.

[39]     The Act neither expressly precludes Zionsville, having reorganized with and assumed the duties of a township, from functioning in a hybrid town/township capacity, nor from exercising the powers of a township when initiating a reorganization. The provisions of Subsections 36-1.5-4-40.5(6) and (7) of the Act indicate that the legislature contemplated that reorganized political subdivisions involving a township and another structure of government would retain broad township powers: if the legislature had intended otherwise, there would have been no need to restrict a reorganized political subdivision from borrowing money for firefighting and other emergency services in the same manner as a township. And as the Indiana Supreme Court observed in *Kole*, our legislature has continually departed from the Dillon Rule regime of limited powers, and "it is far less burdensome … to presume the existence of local authority to act absent some express prohibition." 963 N.E.2d at 498.

The Act affords local governments a free hand in determining their subsequent structures, and lacks express prohibitions on Zionsville's exercise of township powers after its reorganization with Eagle and Union Townships. We accordingly conclude that pursuant to Subsection 36-1.5-4-40.5(2)(B) of the Act, Zionsville was authorized as a result of its reorganization with Eagle and Union Townships in 2010 to act as a township under Subsection 36-1.5-4-1(a)(2) when it adopted the 2014 Zionsville Plan to reorganize with Perry Township.

## Adjacency

We turn next to whether Zionsville was adjacent to Perry Township as that term is defined within the Act.

In a case where two or more townships plan to reorganize together, Subsection 36-1.5-4-1(a)(2) requires that "[a] township reorganizing under this subdivision must be adjacent to at least one (1) other township participating in the reorganizations." Defining adjacency for its purposes, the Act provides, "two (2) political subdivisions may not be treated as adjacent if the political subdivisions are connected by a strip of land that is less than one hundred fifty (150) feet wide." I.C. § 36-1.5-4-2.

Whitestown argues that even if, as we decided above, Zionsville could properly proceed under Subsection 36-1.5-4-1(a)(2) with the 2014 Zionsville Plan, Zionsville is nevertheless precluded from reorganizing with Perry Township because no part of Zionsville's boundaries are adjacent to those of Perry Township. This is so, Whitestown argues, because Zionsville's westernmost

boundary ends where Whitestown's easternmost boundary begins. That boundary line is entirely within territory that belonged to Eagle Township before the dissolution of its township government into that of Zionsville, without any of the boundary touching on the line between Perry Township and Eagle Township. Whitestown insists that the 2014 Zionsville Plan would see Zionsville "leap-frog" over Whitestown to reach Perry Township, something that was not within the legislature's intent when it promulgated the Act. Appellees' Br. at 1.

[44]  We think, in light of Section 36-1.5-4-40.5, that a liberal construction of the adjacency provision cuts differently. While the Act permits political subdivisions to reorganize and redraw their boundaries, a successor political subdivision must still perform the duties of a predecessor political subdivision. *See* I.C. § 36-1.5-4-40.5(2)(A). The language of that provision is instructive:

> the reorganized political subdivision continues to be responsible after the reorganization for providing township services in *all areas of the township*, including within the territory of a municipality in the township that does not participate in the reorganization.

*Id.* (emphasis added). And despite providing for boundary changes in a reorganized political subdivision, I.C. § 36-1.5-4-37, nevertheless a reorganized body of local government must continue to provide services for territory *outside* its redrawn lines.

[45]  In setting forth the effects of reorganization, however, the Act provides "all of the participating political subdivisions, except the reorganized political subdivision, cease to exist," I.C. § 36-1.5-4-6(1), and goes on to set forth what

happens to the political offices, property, and debts of the reorganizing subdivisions. I.C. §§ 36-1.5-4-6(2)-(5). That is, the statute addresses not the disposition of territory, but the disposition of the bureaucratic bodies of a township, municipality, or other body of local government.

[46] Thus, the Act differentiates between the land within a township, i.e., territory that is part of the "area[] of the township," and the governing bodies of a township or municipality. The statute provides that the township, including those portions "that [did] not participate in the reorganization," remains as a geographic entity, even as the bureaucracy associated with governance is reorganized. Thus, a municipality that does not participate in a reorganization of a township remains in the township—the language of township abolition is not used, *see* I.C. § 36-6-1-5, nor does the statute contemplate the prospect of a portion of territory being entirely outside a township. *See* § I.C. 36-6-1-12.

[47] After the 2010 Reorganization, Section 36-1.5-4-40.5 required that Zionsville provide township services for the parts of Whitestown that lay in Eagle Township. The corporate political boundaries of the reorganized Zionsville extended to the boundaries of Whitestown. But Zionsville's role as provider of township services extended farther than this: Zionsville was required to provide township services within Whitestown and to the geographical boundary between Eagle Township and Perry Township. Whitestown acknowledges that Zionsville provided the township services of Eagle Township within the boundaries of Whitestown—portions of Eagle Township that were not part of the reorganization of the Eagle Township and Zionsville governments in 2010.

Nevertheless, the language of Section 36-1.5-4-40.5(2)(A) contemplates the ongoing status of territory outside a reorganization as still being within the same township.

[48] Thus, the Act anticipates home rule reorganization of local government functions unencumbered by the existing township system, but also anticipates that reorganized local governments will be required—without the operation of any interlocal agreement—to provide township services outside their own boundaries. Given the statutory requirement that Zionsville provide township services throughout the geographic territory of Eagle Township, we cannot conclude that Eagle Township simply disappeared, with nothing in its place. Indeed, that result would give rise to precisely the "zombie township" situation that Whitestown argues the legislature did *not* intend to create. Appellee's App'x at 32. Zionsville's continued operation as a township in the space left behind by reorganization, however, places Zionsville-as-township within the otherwise-township-less space in Whitestown, and addresses the "zombie township" contention.

[49] Understood in this light, and interpreted liberally to give effect to the legislature's intent, the adjacency requirement is not to be taken as a kind of technical, "gotcha" provision. Rather, the adjacency requirement ensures that townships with like interests and common borders may reorganize together in the interests of efficiency. This adjacency provision ensures that far-flung municipalities and townships without any meaningful geographical relationship to one another cannot reorganize together—as would have been the case had

Zionsville, as the successor governing body of Eagle Township, sought to reorganize with a more distant township than Perry Township. All of this serves the purposes of the Act: to permit better cooperation among local governments, improve the ease of operation of local government, enhance the provision of government services, and reduce the cost of local government to taxpayers and to the state-level government of Indiana. I.C. § 36-1.5-1-1.

[50] Crucially, the purposes of the Act and the adjacency rules of Section 36-1.5-4-2 function to differentiate the reorganization at issue in the 2014 Zionsville Plan from an older means of extending the geographic reach of local government— annexation. Annexation under the Indiana Code requires contiguity:

> [T]erritory sought to be annexed may be considered "contiguous" only if at least one-eighth ( ⅛ ) of the aggregate external boundaries of the territory coincides with the boundaries of the annexing municipality. In determining if a territory is contiguous, a strip of land less than one hundred fifty (150) feet wide which connects the annexing municipality to the territory is not considered a part of the boundaries of either the municipality or the territory.

I.C. § 36-4-3-1.5. In certain cases involving annexation of privately-owned land, contiguity also requires the consent of the landowners of the property sought for annexation. *Delph v. Town Council of Town of Fishers*, 596 N.E.2d 294, 297 n. 4 (Ind. Ct. App. 1992).

[51] Here, Zionsville provided township services throughout the geographical bounds of Eagle Township up to the boundary with Perry Township. That is, Zionsville served as the township-level government for portions of Eagle Township that, while incorporated within Whitestown, received Eagle

Township services before and after the 2010 Reorganization. Perry Township's legislature adopted a plan to reorganize with Zionsville under the provisions of the Act in order to deliver township services more efficiently within the geographic scope of Perry Township. Whitestown, while not participating in the reorganization, will continue to see township services provided by Zionsville as the successor to the governmental bodies of Perry and Eagle Townships, a necessary result of the application of the Act after successive reorganizations of township government in Boone County.

[52] The language employed by the Act requiring that "the reorganized political subdivision…be responsible after the reorganization for providing township services in all areas of the township," I.C. § 36-1.5-4-40.5(2)(A), does not contemplate the abolition of township boundaries—only the reorganization of township governing bodies. Zionsville prior to the 2014 Zionsville Plan was providing township services throughout the full geographical scope of Eagle Township—that is, up to the boundary line between Eagle and Perry Townships—after having reorganized with the governing body of Eagle Township. Under the 2014 Plan, Zionsville would continue to provide these township services in Eagle and Perry Townships. The townships remain in name and with geographic boundaries set forth in the descriptions maintained by the county executive. *See* I.C. § 36-6-1-2. But the manifestation of the body responsible for governance and services within these boundaries is established by the Plan created in accordance with the Act. And, while the Plan may change the form and structure of the governing body traditionally responsible

for these matters, this flexibility in local government structure at various levels of operation is at the heart of the Act.

[53] In light of the foregoing, we conclude that the adjacency requirement in Section 36-1.5-4-2 was satisfied. Accordingly, the trial court erred when it entered summary judgment against Zionsville as to its ability to reorganize with Perry Township under Section 36-1.5-4-1(a)(2).

# Voting Districts

[54] Zionsville also challenges the trial court's entry of summary judgment with respect to the determination of voting districts for the public question on the 2014 Zionsville Plan. The applicable provision of the Act for voting districts in a public question concerning the reorganization of two townships under Subsection 36-1.5-4-1(a)(2), based upon which we have held Zionsville could proceed with the 2014 Plan, provides:

> A reorganization as specified in the plan of reorganization is approved if a majority of the voters in each reorganizing political subdivision voting on the public question approve the public question on the reorganization. If a reorganizing political subdivision includes the territory of another reorganizing political subdivision, the vote of voters of a reorganizing political subdivision who also are voters in a second reorganizing political subdivision that is geographically larger than the first political subdivision and that includes the territory of the first political subdivision shall be included only in the tally of votes for the first reorganizing political subdivision in which the voters reside.

I.C. § 36-1.5-4-32(a).

Because the trial court concluded that Zionsville could not properly pursue reorganization with Perry Township, it addressed the foregoing statute only in a cursory manner, concluding:

> The Court does find…that the [2010 Zionsville] Plan's voting areas do not comply with either I.C. 36-1.5-4-32(a) or (b). The Plan provides only that a majority of voters in two (2) voting areas must approve it: (1) the Town of Zionsville, and (2) Perry Township. Therefore, [the Plan's] voting areas are not consistent with the Act's requirements for townships reorganizing under I.C. 36-1.5-4-1(a)(2) or for a municipality reorganizing with a township under I.C. 36-1.5-4-1(a)(7)…

Appellant's App'x at 25.

Zionsville argues on appeal that the entire question of voting districts is moot because an election occurred in November 2014, the issue was put to voters on ballots, and the voters accepted the 2014 Zionsville Plan. Zionsville argues that, mootness notwithstanding, the voting districts were proper, and in any event Whitestown waived this aspect of its challenge because it took no action to obtain relief from local elections officials. In response, Whitestown proposes several possible permutations of voting districts, none of which the 2014 Zionsville Plan set forth; in the absence of these, Whitestown contends, the 2014 Zionsville Plan must fail.

Because we have concluded that Zionsville could proceed under Subsection 36-1.5-4-1(a)(2), only Subsection 36-1.5-4-32(a)'s requirements for voting districts applies. The terms of that provision govern the counting of votes for purposes of determining the outcome of a voter referendum on a public question where

there are overlapping political subdivisions, both of which are reorganizing. They apply only "[i]f a reorganizing political subdivision includes the territory of another reorganizing political subdivision." *Id.*

[58] Whitestown insists that, under the Act, Zionsville's standing in the place of Eagle Township (and, for that matter, Union Township) requires that each township's voters be counted separately, and that the pre-2010 reorganization Town of Zionsville also be counted separately. This contention does not take into account the difference created by the Act between political subdivisions—that is, the political bodies elected by voters—and the territorial boundaries established as the townships. As we observed above, it is the aim of the Act to streamline the operation of the political subdivisions. Consonant with this, under the terms of the Act, the votes in each of the separate "reorganizing political subdivisions" must reach a majority. I.C. § 36-1.5-4-32(a).

[59] Here, there were only two political subdivisions at issue in the reorganization: Perry Township and the reorganized Town of Zionsville. These were the two political bodies seeking to reorganize together; the political subdivisions of Eagle and Union Township had ceased to exist, and the Act thus did not require that the votes of Eagle and Union Township be separated and counted separately from those of the rest of Zionsville. And because Perry Township and Zionsville did not overlap with one another, there was no statutory requirement for the type of vote-counting procedures contemplated by Section 36-1.5-4-32.

[60] We accordingly conclude that the trial court erred on a matter of law when it construed the Act to require more than the two voting districts representing Perry Township and Zionsville.[8]

# Annexation

[61] We turn now to the counterclaim Zionsville presented to the trial court, which alleged that Whitestown could not proceed with an effort to annex territory that had already been identified as part of the area to be incorporated into Zionsville under the 2014 Zionsville Plan.

[62] In the summary judgment proceedings, neither party presented evidence that Whitestown had completed the annexation of the areas of Perry Township designated by the 2014 Ordinances. Because we have concluded that Zionsville was not precluded from reorganizing with Perry Township under the 2014 Zionsville Plan, thereby reversing the trial court's entry of summary judgment, we must address the implications of that decision for Whitestown's annexation efforts.

[63] Annexation and disannexation of land by municipalities is governed by Indiana Code chapters 36-4-3 and -4. The procedures and requirements for annexation under these statutes are distinct from the reorganization mechanisms set out by

---

[8] We observe further that, even if the trial court had *not* erred on this question, nevertheless Indiana's law and public policy, which favors the recognition of the decisions of voters despite apparent substantive questions of disqualification, disfavors vacation of election results where there is no evidence of the intentional wasting of votes. *See White*, 963 N.E.2d at 486.

the Government Modernization Act. In addition to the congruity requirements discussed above, incorporated municipalities must conform to other substantive and procedural requirements. Of particular note in the present case is the annexation statute's provision governing annexation of territory within municipalities: "a municipality may not annex territory that is inside the corporate boundaries of another municipality, although municipalities may merge under IC 36-4-2." I.C. § 36-4-3-2.

[64] The Act adds an additional restriction to annexations. Protecting the territories of reorganizing political subdivisions, the Act provides:

> (b) A political subdivision may not take any of the following actions partially or wholly within a reorganizing political subdivision after the date on which a plan of reorganization is finally adopted by all reorganizing political subdivisions unless all reorganizing political subdivisions agree by adopting identical resolutions:
>
> > (1) Initiate an annexation of territory.
> >
> > ***
>
> (c) This chapter does not prohibit:
>
> > (1) a political subdivision subject to the reorganization from taking an action under subsection (b) within the political subdivision's own boundaries; and
> >
> > (2) any of the reorganizing political subdivisions from taking an action under subsection (b) for the purpose of implementing the plan of reorganization.
>
> (d) A political subdivision may take an action described in subsection (b) after the date on which the reorganization is rejected by the voters under section 33 of this chapter.
>
> (e) If a reorganization is approved by the voters under section 34 of this chapter, a political subdivision may not take an action under subsection (b) until the earlier of the following:

> (1) The plan of reorganization has been implemented.
>
> (2) One (1) year after the date on which the reorganization is approved under section 34 of this chapter.

I.C. § 36-1.5-4-45.

[65] In conjunction with this provision, the statute governing municipal annexations generally provides, "If a township is a participant in a proposed reorganization…[under the Act]… a municipality may not adopt an annexation ordinance annexing territory within the township within the period set forth in IC 36-1.5-4-45." I.C. § 36-4-3-1.4.

[66] Zionsville, in its counterclaims, alleged that Whitestown could not properly seek to annex portions of Perry Township's territory because the annexation was not initiated prior to the 2014 Zionsville Plan. Zionsville and Whitestown disagree upon the meaning of "initiate" in Subsection 36-1.5-4-45(b)(1). Zionsville would define that term as requiring, in the broad scheme of an annexation, the adoption of a fiscal plan by Whitestown as required under Indiana Code section 36-4-3-3.1. Whitestown disagrees, and argues that initiating an annexation for purposes of the Act means to begin the statutory process for annexation by first proposing an annexation in the municipal legislature.

[67] To determine the meaning of "initiate" as used in Subsection 36-1.5-4-45(b)(1), we turn to the plain language of Sections 36-1.5-4-45 and 36-4-3-1.4 in conjunction with one another. "Initiate" as used in the Act must be construed in light of the limitations upon annexation imposed by Section 36-4-3-1.4.

Section 36-4-3-1.4, defines "initiate" for purposes of Subsection 36-1.5-4-45(b)(1) Act by providing that "a municipality may not adopt an annexation ordinance … within the period set forth in IC 36-1.5-4-45." To initiate an annexation in that context is to "adopt an annexation ordinance." I.C. § 36-4-3-1.4. This is a statutory requirement distinct from prior case law, which addressed initiation of proceedings outside the context of the Act. *See, e.g., Ensweiler v. City of Gary*, 169 Ind. App. 642, 644-645, 350 N.E.2d 658, 659 (1976) (noting that "in order to be 'first,' a proceeding must have been validly instituted," and that "the city's annexation ordinance had been introduced and had passed two readings" before a competitive measure was filed with a county commission).

[68] Whether the trial court erred in its summary disposal of Zionsville's counterclaim challenging Whitestown's annexation effort, then, turns upon when Whitestown adopted its annexation ordinances. Generally, "[a]n ordinance…passed by the legislative body [of a town] is considered adopted when it is signed by the executive. If required by statute, an adopted ordinance…must be promulgated or published before it takes effect." I.C. § 36-5-2-10(a). However, our annexation statutes set forth numerous prerequisites to the adoption of an annexation ordinance. An annexation ordinance may be adopted between thirty and sixty days after a public hearing on the ordinance. I.C. § 36-4-3-2.1(c). But that hearing must occur "not earlier than sixty (60) days after the date the ordinance is introduced," I.C. § 36-4-3-2.1(b), and the

annexing municipality must provide written notice of the proposed annexation ordinance and the public hearing. I.C. §§ 36-4-3-2.1(b) & (d).

[69] Under the statutes, then, if Whitestown had adopted its annexation ordinances before Zionsville and Perry Township adopted the final 2014 Zionsville Plan, Whitestown would have initiated its annexation before the final 2014 Plan was adopted. But this is not the case.

[70] Both parties argue that the conventional first-in-time rules, as discussed in *Covered Bridge Homeowners Ass'n v. Town of Sellersburg*, should apply in determining when action to establish exclusive control over a subject matter has occurred. 971 N.E.2d 1222 (Ind. Ct. App. 2012), *trans. denied*. In *Covered Bridge*, this Court held:

> [W]hen two governmental entities may possess "concurrent and complete" authority over a subject matter, *the authority becomes exclusive in the one before which proceedings are first validly instituted*, and that entity has a duty to retain its authority and "proceed to a final hearing and disposition." *Taylor* [*v. City of Fort Wayne*], 47 Ind. [274,] 282 [(1874)]. This is not to say that the second entity cannot attempt to exercise its own authority (perhaps because it believes that the first entity invalidly exercised its authority), only that it risks ending up on the losing side of a declaratory judgment action.

*Id.* at 1232 (emphasis added).

[71] The 2014 Zionsville Plan was adopted on May 20, 2014, with intent to proceed toward a public question presented to the electorate in 2014. Whitestown first proposed the annexation ordinances on April 22, 2014. Proposal of the ordinances, while a first step toward annexation, is not the measure of initiation

of an annexation under Section 36-1.5-4-45. Rather, as we concluded above, initiation of an annexation under Section 36-1.5-4-45 is measured by the *date upon which an annexation ordinance is adopted*. Adoption of the ordinances is subject to the statutory procedures and timeframes discussed above. By creating a kind of "race" between annexation and reorganization, with a set of formal requirements that favors reorganization, the legislature expressed its intent to favor local governments' reorganization efforts, involving the consent of voters, over more traditional annexation measures.

[72] Here, by May 20, 2014, Whitestown had not yet satisfied the statutory prerequisites to adoption of the annexation ordinance.[9] Zionsville's 2014 Plan was therefore first-in-time over and against Whitestown's annexation efforts. Whitestown did not initiate the annexation within the terms of the Act, and Zionsville was entitled to summary judgment on its counterclaims challenging Whitestown's ability to annex the portions of Perry Township that were included in the 2014 Zionsville Plan.

[73] Because we have concluded that there was no bar to the 2014 Zionsville Plan, and because voters approved that plan, those portions of Perry Township that were within the scope of the 2014 Plan's reorganization were incorporated into Zionsville. And because Whitestown cannot annex land incorporated into

[9] Because we conclude that the required public hearing period had not yet elapsed before the 2014 Zionsville Plan was formally adopted on May 20, 2014, we do not address Zionsville's specific contention that adoption of a fiscal plan is the proper measure for when an annexation is initiated as contemplated by the Act.

another municipality, *see* I.C. § 36-4-3-2, Whitestown's 2014 Ordinances must necessarily fail.

[74] Excluded from this holding, however, is a single parcel of land: that land which is the subject of the 2013 Whitestown annexation for the Waste Water Treatment Plant, designated in the 2013 Annexation that was adopted under the annexation statutes prior to the 2014 Zionsville Plan. An appeal of the 2013 Annexation is pending. Upon resolution of the litigation on the 2013 Annexation, the statutes then in effect would govern any subsequent reorganizations or annexation efforts by Zionsville, Whitestown, or other local government.

[75] We accordingly conclude that the trial court erred when it granted summary judgment in favor of Whitestown as to Zionsville's counterclaims challenging Whitestown's annexation plans. We decline to consider the effect of the 2014 Plan on the 2013 Waste Water Treatment Plant Annexation.

# Conclusion

[76] Zionsville's appeal is not moot. The trial court erred when it entered summary judgment for Whitestown and against Zionsville on the question of whether Zionsville was denied authority under the Act to reorganize with Perry Township. The trial court also erred as to the question of the voting districts associated with the 2014 Zionsville Plan. Zionsville was improperly denied summary judgment as to its claims concerning the viability of Whitestown's

annexation efforts. We therefore vacate the order, but decline to consider the effect of the 2014 Plan on Whitestown's effort to annex territory for their Waste Water Treatment Plant, because that matter is the subject of another pending appeal.

[77] We accordingly reverse the entry of summary judgment and remand this case to the trial court with instructions to enter judgments consistent with our opinion today.

[78] Reversed and remanded.

Robb, J., and Brown, J., concur.